a

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
### SHREVEPORT DIVISION

| | |
|---|---|
| ANTHONY LEMARCUS LARKINS #419715, Plaintiff | CIVIL DOCKET NO. 5:20-CV-01368 SEC P |
| VERSUS | JUDGE ELIZABETH E. FOOTE |
| DARREL VANNOY, Defendants | MAGISTRATE JUDGE PEREZ-MONTES |

---

## REPORT AND RECOMMENDATION

Before the Court is a Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254 (ECF No. 1) filed by pro se Petitioner Anthony LeMarcus Larkins ("Larkins"). Larkins is an inmate in the custody of the Louisiana Department of Corrections, incarcerated at the Louisiana State Penitentiary in Angola, Louisiana. Larkins challenges his conviction in the First Judicial District Court, Caddo Parish.

Because Larkins's Petition (ECF No. 1) is meritless, it should be DENIED and DISMISSED WITH PREJUDICE.

## I.    Background

Larkins was indicted on October 17, 2013, for the aggravated rape of D.W., a child under the age of 13 at the time of the offense, which occurred between 2003 and 2004. ECF No. 11-3 at 14. The court appointed an indigent defender to represent Larkins, and counsel appeared with Larkins at the arraignment. ECF No. 11-3 at

10.  In 2015, Larkins moved to waive counsel and filed numerous pro se motions, including a motion to waive his right to a jury trial.  ECF No. 11-3 at 11, 88-222.

A bench trial was conducted on August 30 2016.  ECF No 11-4 at 3.  Larkins represented himself, with court-appointed counsel on standby.  *Id.*  The trial judge found him guilty of the aggravated rape of D.W.  Larkins was sentenced to life imprisonment.  *State v. Larkins*, 51,540 (La.App. 2 Cir. 9/27/17, 1–6); 243 So.3d 1220, 1221–24.

Larkins appealed, arguing that there was insufficient evidence to convict him, but the conviction was affirmed.  *Id.*  Larkins sought further review in the Louisiana Supreme Court, which denied writs.  *State v. Larkins*, 2017-1900, p. 1 (La. 9/28/18); 253 So.3d 154.  He did not seek review in the United States Supreme Court.

Larkins filed an application for post-conviction relief raising three claims: (1) his conviction is unconstitutional because the trial court improperly relied on testimony from an impeached witness; (2) his right to a speedy trial was violated because the alleged conduct happened over 10 years prior to trial; and (3) he was deprived of a jury trial and the assistance of counsel based on an unconstitutional Louisiana law.  ECF No. 1-2 at 67-69.  The trial court denied the application.  ECF No. 1-2 at 56-60.

Larkins sought review in the Louisiana Second Circuit Court of Appeal.  ECF No. 1-2 at 30-54.  The appellate court denied relief on the showing made.  ECF No .1-2 at 28.  The Louisiana Supreme Court also denied writs, noting that Larkins did not meet his burden of proof.  *State v. Larkins*, 2020-00610 (La. 9/29/20); 301 So.3d 1167.

In his § 2254 Petition, Larkins asserts: (1) his conviction was based on impeached testimony; (2) he was denied the right to a speedy trial; (3) he was denied procedural safeguards for capital cases; and (4) the evidence was insufficient to convict him. ECF No. 1. The State concedes and the Court finds that Larkins's claims are timely and exhausted based on the record.

## II.    Law and Analysis

### A.    Rule 8(a) Resolution

The Court is able to resolve Larkins's § 2254 Petition without the necessity of an evidentiary hearing because there are no genuine issues of material fact relevant to his claims, and the state court records provide an adequate factual basis. *See Moya v. Estelle*, 696 F.2d 329, 332-33 (5th Cir. 1983); *Easter v. Estelle*, 609 F.2d 756, 761 (5th Cir. 1980); Rules Governing Section 2254 Cases.

### B.    Standard of Review

An application for writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall be considered only on the ground that he is in custody in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a). The role of a federal habeas court is to guard against extreme malfunctions in the state criminal justice systems, not to apply de novo review of factual findings or to substitute its own opinions for the determinations made by the trial judge. *See Davis v. Ayala*, 576 U.S. 257, 276 (2015) (citing *Harrington v. Richter*, 562 U.S. 86, 102–03 (2011)).

Under § 2254 and the AEDPA, habeas relief is not available to a state prisoner with respect to a claim that was adjudicated on the merits in state court unless the adjudication of the claim: (1) resulted in a decision that was contrary to or involved an unreasonable application of clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *See Martin v. Cain*, 246 F.3d 471, 475-76 (5th Cir. 2001), *cert. den.*, 534 U.S. 885 (2001).

Therefore, § 2254(d) demands an initial inquiry into whether a prisoner's claim has been "adjudicated on the merits" in state court. If it has, the AEDPA's highly deferential standards apply. *See Davis*, 576 U.S. at 269 (citing *Richter*, 562 U.S. at 103).

When a federal claim has been presented to a state court and the state court has summarily denied relief without a statement of reasons, it may be presumed that the state court adjudicated the claim on the merits, in the absence of any indication of state law procedural principles to the contrary. *Richter*, 562 U.S. at 99. A habeas court must "determine what arguments or theories supported or, as here, could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *See Richter*, 562 U.S. at 102. Where a state court's decision is unaccompanied by an explanation, the habeas

petitioner's burden must be met by showing there was no reasonable basis for the state court to deny relief. *Richter*, 562 U.S. at 98.

A state court decision is "contrary to" clearly established Supreme Court precedent if the state court applies a rule that contradicts the governing law set forth in Supreme Court cases, or confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a result different from Supreme Court precedent. A state court decision falls within the "unreasonable application" clause when it unreasonably applies Supreme Court precedent to the facts. *See Martin*, 246 F.3d at 476; *see also Rivera v. Quarterman*, 505 F.3d 349, 356 (5th Cir. 2007), *cert. den.*, 555 U.S. 827 (2008).

A federal habeas court should ask whether the state court's application of clearly established federal law was objectively reasonable. A federal court cannot grant habeas relief simply by concluding that the state court decision applied clearly established federal law erroneously; the court must conclude that such application was also unreasonable. *See Martin*, 246 F.3d at 476. An unreasonable application is different from an incorrect one. *See Bell v. Cone*, 535 U.S. 685, 694 (2002). When a state court determines that a constitutional violation is harmless, a federal court may not award habeas relief under § 2254 unless the harmlessness determination itself was unreasonable. *See Mitchell v. Esparza*, 540 U.S. 12, 18 (2003); *see also Davis*, 135 S. Ct. at 2199 (citing *Fry v. Pliler*, 551 U.S. 112, 119 (2007)).

C.    <u>The evidence was sufficient to convict.</u>

Larkins claims that the evidence was insufficient to convict him because D.W., his mother, and his sister gave materially inconsistent testimony, and there was at least one reasonable theory that precluded a finding of guilt.

Review of a sufficiency of the evidence claim is "doubly deferential." The state court decision may not be overturned on federal habeas review unless the decision was an objectively unreasonable application of the deferential standard of *Jackson v. Virginia*, 443 U.S. 307 (1979). *See Parker v. Matthews*, 567 U.S. 37, 43; *Harrell v. Cain*, 595 F. App'x 439 (5th Cir. 2015). The *Jackson* inquiry "does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a rational decision to convict or acquit." *Herrera v. Collins*, 506 U.S. 390, 402 (1993).

When analyzing a *Jackson* claim, the federal habeas court must look to the substantive elements of the offense under state law. *Norris v. Dretke*, 826 F.3d 821, 833 (5th Cir. 2016), *cert. denied*, 137 S.Ct. 1203 (2017). The Court must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319. The habeas court may not substitute its interpretation of the evidence or assessment of credibility for that of the factfinder. *Weeks v. Scott*, 55 F.3d 1059, 1062 (5th Cir. 1995). All credibility determinations and conflicting inferences are to be resolved in favor of the verdict. *See Ramirez v. Dretke*, 398 F.3d 691, 695 (5th Cir. 2005), *cert. denied*, 546 U.S. 831 (2005).

In 2003 and 2004, La. R.S. 14:42(A)(4) defined aggravated rape for purposes of this matter as anal, oral, or vaginal sexual intercourse that is deemed to be without lawful consent of the victim because the victim is under the age of 13.[1]  In Louisiana, the testimony of a single witness is sufficient to support a rape conviction even in the absence of medical, scientific, or physical evidence.  *See State in the Interest of E.S.*, 2018-01763, p.14-15 (La. 10/22/19), 285 So.3d 1046, 1057 (and cases cited therein).

The record, summarized by the appellate court, provides:

The first witness at trial was D.W., who testified that he was born on January 15, 1997, and currently lives in Shreveport, Louisiana, with his mother and two sisters. He stated that he, his mother and his sister previously lived with his great-grandparents in Shreveport from the time he was in preschool until about first or second grade. While they were living there, Defendant began dating his mother. D.W., his mother and his sister moved in with Defendant and his son in 2003.

D.W. further testified that his mother worked the night shift at Wal–Mart, and Defendant or D.W.'s great-grandparents would watch him and his sister while their mother worked. He stated that when Defendant was watching them, Defendant would take him into the master bedroom and force him to perform oral sex on him. He noted that he was in the second or third grade at that time and that his sister was present on at least two occasions. He further stated that Defendant also forced him and his sister to remove their clothes and touch each other's private parts while he watched.

According to D.W., he eventually told his aunt about Defendant's conduct, and she called Child Protective Services ("CPS"). After his aunt contacted CPS, he briefly lived with his aunt in Shreveport, while his mother and sister moved into an apartment. He stated that after living with his aunt for one year, he moved to Georgia with his mother, his sister and his newborn sister, where they resided for approximately 2½ years. He testified that his family returned to Shreveport when he was age 10 or 11 and lived with his mother's friend, Keshia Prim. Defendant

---

[1] As the State points out, the Louisiana Legislature amended the statute by Act. No. 795, effective August 2003, to change the age from 12 to 13.  The indictment charges that the victim, D.W., was under the age of thirteen.  Since D.W., whose date of birth is January 15, 1997, was age six in 2003, the change in the statue was of no relevance to the charged offense.

frequently visited the family at Prim's home, and D.W., his mother and his sisters moved back in with him a year later.

D.W.'s sister (whose initials are also D.W.) testified that shortly after her family moved into Defendant's home in 2003, Defendant called her and her brother into the master bedroom and twice forced her to watch D.W. perform oral sex on him. She noted that the incidents generally occurred at night when their mother was at work. She further stated that on at least one occasion, Defendant forced her and D.W. to remove their clothes and attempted to force them to have sex with each other in the living room. She testified, "I was laying on the floor, and he [Defendant] made [D.W.] get on top of me and try to put his private part in me. And if we didn't do it, [Defendant] would whoop us." She further testified that she told her mother of the incident, but she could not recall her mother's response. After the incident, she, D.W. and her mother first moved to the Villa del Lago apartments and then relocated to Georgia.

D.W.'s sister corroborated his testimony that upon returning to Shreveport several years later, the family lived with a friend for a brief period, but eventually moved back in with Defendant. She stated that, while living with him, Defendant choked her and then offered her money in exchange for sex. She testified that she initially resisted his repeated advances, but ultimately agreed to have sex with him. D.W.'s sister noted she was 15 years old when she and Defendant first had sex, and they engaged in vaginal sexual intercourse approximately two or three times a month. The encounters occurred either in her room or her mother's room and always when her mother was at work. She testified that her mother, K.W., discovered she and Defendant were having sex after reading text messages between her and her boyfriend, "Trey," which detailed her sexual encounters with Defendant. After reading the text messages, K.W. called the police and CPS.

K.W. testified that she has three children, D.W. and her older daughter (who are not Defendant's biological children), and her younger daughter (who is Defendant's biological daughter). She stated that she met and began dating Defendant in 2002 while working at the Wal–Mart on Mansfield Road. She, D.W. and D.W.'s sister were living with her grandparents at that time. The three of them eventually moved in with Defendant, his mother and his son in 2003. She testified that Defendant and his mother would watch the children while she was working. She further noted that she got into an argument with Defendant because he was spanking her children; and, as a result, the three of them moved back into her grandparents' home in 2004. It was there that D.W. told her that Defendant forced him and his sister to engage in sexual

activities either with each other or with Defendant. She stated that D.W. did not appear to understand that Defendant's behavior was inappropriate. She called CPS, but she did not know what happened with the investigation. She discovered she was pregnant with Defendant's child after reporting him to CPS. After she delivered the baby, she moved to Georgia with her children, where she lived for several years. She moved back to Shreveport, and Defendant moved into her house with her and her children.

K.W. further testified that Defendant had been living with her and the children for approximately eight months when she learned that he was paying her older daughter for sex. She stated that she confronted Defendant and began hitting him. She then locked herself in her car, called the police and remained there until the police arrived.

Sergeant Anthony Rei, a sex crimes investigator and officer with the Shreveport Police Department, testified that in 2007, he was assigned to conduct a follow-up investigation for the alleged crimes against D.W. and his sister in 2003. He stated that prior to his involvement, another officer had been assigned to investigate the allegations, but no action had been taken. He testified that he contacted K.W., via letter, informing her that he was following up on the 2003 investigation and asking her whether she was willing to pursue criminal charges. K.W. advised him that she did not want to pursue charges because she did not intend to return to Shreveport. Based on this response, he closed the case.

Corporal Stephen Desselle, a patrol officer with the Shreveport Police Department, testified that on August 12, 2013, he was dispatched to a residence at 3146 Pleasant Drive in response to an alleged sexual assault. Upon arriving at the home, he met K.W. in the front yard and took her statement. Based on that statement, he detained Defendant and placed him in the back seat of the patrol unit. After securing Defendant, he made contact with D.W.'s sister, who admitted that she had sexual intercourse with Defendant approximately ten times in exchange for money. He advised Defendant of his Miranda rights and interviewed him, but Defendant denied any knowledge of the crime. He stated that he contacted Det. Jeff Allday in the sex crimes unit and also CPS. He wrote a report and then turned the investigation over to Det. Allday.

Corporal Saiz, an officer with the Shreveport Police Department, who was also dispatched to 3146 Pleasant Drive on August 12, 2013, testified that he and a third officer spoke to D.W. at the scene. He stated that

D.W. appeared nervous about speaking, but told the officers that when he was a child, Defendant would give him money and gifts in exchange for performing oral sex on him.

Finally, Det. Allday testified that he is an investigator in the Shreveport Police Department sex crimes unit and was assigned to the instant case on August 12, 2013.   Upon arriving on scene, he spoke with Cpl. Desselle, who relayed D.W.'s sister's story to him.   He stated that he transported D.W. and his sister to the Gingerbread House, where he interviewed them. Based on their statements, he obtained an arrest warrant for Defendant. He could not recall whether he was the arresting officer, but noted that he did not interview Defendant after his arrest because he believed he would continue to deny the charges.

On cross-examination, Det. Allday stated that he questioned K.W. on August 14, 2013, who stated that she did not remember the specific acts her children were forced to do for Defendant, but did remember that they were sexual in nature.  He recalled that K.W. stated that she had asked her youngest child, Defendant's biological daughter, whether Defendant had touched her private part, and the little girl responded that Defendant had made her touch his private part.

*State v. Larkins*, 51,540 (La.App. 2 Cir. 9/27/17, 1–6); 243 So.3d 1220, 1221–24.

Both D.W. and his sister testified that Larkins made D.W. perform oral sex on him when D.W. was under the age of 13.  The trial judge specifically found D.W.'s and his sister's testimony to be credible.  ECF No. 11-4 at 130.  "The Court observed very carefully [D.W.'s] demeanor on the stand."  *Id.*  "[D.W.] articulated in great detail the acts of which he was subjected to the hands of Mr. Larkins."  *Id.*  "The Court found both of these very young witnesses to be very credible, reliable.  Their demeanor on the stand was shame, embarrassment and great emotional pain."  *Id.*

Even though the judge found both victims' testimony to be credible, D.W.'s testimony alone is sufficient to support the conviction.  *See State in the Interest of E.S.*, 285 So.3d at 1057.   Additionally,  the  appellate  court  recognized  the

reasonableness of the trial court's credibility determination and found that there was no irreconcilable conflict in the testimony regarding Larkins's abuse of D.W. *Larkins*, 243 So.3d at 1225.

Viewed in the light most favorable to the prosecution, as required by *Jackson*, the evidence was sufficient to prove Larkins's guilt beyond a reasonable doubt. Larkins fails to show that the state court's adjudication of his sufficiency of the evidence claim was an objectively unreasonable application of the deferential *Jackson* standard. *See Parker*, 567 U.S. at 43.

**D.** <u>Larkins does not establish the use of impeached testimony at trial.</u>

Larkins claims that the testimony of D.W., his sister, and his mother was impeached and cannot support his conviction.   The trial court specifically found that the witnesses were not impeached:

> In the instant matter, the Court found both testifying witnesses [D.W. and his sister] credible and reliable.  Thus, the trier of fact weighed the evidence and subsequently concluded there was proof beyond a reasonable doubt that Petitioner had committed the crimes of which he was accused of.  Therefore, Petitioner did not impeach his accuser's testimony nor that of the other witness, therefore Petitioner's first argument does not satisfy the requirements of La. C. Cr. P. arts. 926(B)(3) and 930.2.

ECF No. 11-5 at 195.  The appellate court also denied relief because Larkins had not met his burden of proof.  ECF No. 1-2 at 28.

Like the *Jackson* claim, Larkins does not show that the state court's adjudication was contrary to or involved any objectively unreasonable application of clearly established federal law, or that it involved any unreasonable determination of

the facts as required by §2254(d). Larkins does not cite any clearly established federal law as determined by the Supreme Court in support of this claim.

### E.   <u>Larkins was not deprived of due process or a speedy trial.</u>

Larkins complains that he was denied rights to a speedy trial and due process under the Fourteenth Amendment because he was tried for actions that occurred over ten years prior to trial. ECF No. 1. The trial court denied this claim on post-conviction review because, although the crime was committed in 2003, the investigation into D.W.'s claims was not conducted until 10 years later when Larkins was arrested for paying D.W.'s teenage sister to have sex with him. After the investigation was conducted, Larkins was tried within three years from the indictment. ECF No. 11-5 at 197.

Larkins relies on *Doggett v. United States*, 505 U.S. 647 (1992), in support of his claim. However, in *Doggett*, the issue was whether an 8.5-year delay between the indictment and trial violated the defendant's right to a speedy trial. The Court considered the length of delay before trial; whether the government or defendant was to blame for the delay; whether the defendant asserted a right to speedy trial; and whether he was prejudiced by the delay. *Id.* at 651. None of these considerations support Larkins's claim.

Speedy trial delays do not begin until the prosecution commences. *See Rodriguez v. Goodwin*, 20-CV-3083, 2021 WL 1877496, at *9 (E.D. La. 2021), *report and recommendation adopted*, 2021 WL 1856986 (E.D. La. 2021); *Harvey v. Kent*, 19-CV-12891, 2020 WL 2042780, at *5 (E.D. La. 2020), *report and recommendation*

*adopted*, 2020 WL 2037178 (E.D. La. 2020), *certificate of appealability denied*, 20-30318, 2021 WL 4767938 (5th Cir. 2021), *cert. denied*, 142 S.Ct. 603 (2021) ("For purposes of speedy trial in Louisiana, a prosecution commences 'on the date of filing of the indictment, or the filing of a bill of information, or affidavit, which is designed to serve as the basis of a trial.'"); La. Code Crim. P. art. 934(7).  Larkins was tried within three years of the commencement of his prosecution.  Larkins does not complain about the three years that passed from indictment to trial.  Larkins did not file a speedy trial motion.  In fact, Larkins filed several motions to continue and countless pro se motions, which delayed the case.  ECF No. 11-5 at 5, 196.

Moreover, Larkins does not allege any prejudice from the three-year delay.  The alleged 10-year delay is of no consequence because the investigation and indictment did not happen until 2013.

Larkins does not show that the state court's adjudication was contrary to or involved any objectively unreasonable application of clearly established federal law, or that it involved any unreasonable determination of the facts as required by §2254(d).

F.    <u>La. R.S. 14:42(D)(2)(b) is not unconstitutional.</u>

Larkins alleges that La. R.S. 14:42(D)(2)(b) is unconstitutional under both the state and federal constitutions, because it removes the procedural safeguards of a mandatory jury trial, a unanimous verdict, and the mandatory assistance of counsel from a capital case.  However, Larkins was not facing capital punishment if convicted; he opted for a bench trial; and he elected to represent himself.

Under Louisiana law, a district attorney may decide to seek a capital verdict for a case of aggravated rape with a victim under age 13. *See* La. R.S. 14:42(D)(2). If the district attorney seeks a capital verdict, the case "shall be tried by a jury of twelve jurors, all of whom must concur to render a verdict." La. C. Cr. P. art. 782; La. R.S. 14:42(D)(2). If the district attorney does not seek a capital verdict, however, article 782 provides for trial by a 12-person jury. *Id.* The statute expressly states that a defendant can knowingly and intelligently waive a jury trial in non-capital cases. *See* La. C. Cr. P. art. 782.

On post-conviction review, the trial court noted that Larkins's case was a non-capital case in which the death penalty was not a possible verdict. The judge also pointed out, and the record reflects, that Larkins moved to be tried by the judge and waived his right to a jury trial in open court. ECF No .11-3 at 13 (waiving jury trial on July 26, 2016 and August 30, 2016). Larkins also voluntarily waived his right to counsel, having asked to represent himself in 2015 and affirming at trial that he was representing himself. ECF No. 11-5 at 197; ECF No. 11-3 at 11; ECF No. 11-4 at 6.

Larkins does not show that the state court's adjudication was contrary to or involved any objectively unreasonable application of clearly established federal law, or that it involved an unreasonable determination of the facts as required by §2254(d). Larkins cites no clearly established federal law holding that La. R.S. 14:42(D)(2)(b) is unconstitutional.[2]

---

[2] Larkins cites *Kennedy v. Louisiana*, 554 U.S. 407, 421 (2008), which held that "a death sentence for one who raped, but did not kill, a child, and who did not intend to assist another in killing the child, is unconstitutional under the Eighth and Fourteenth Amendments." Larkins did not receive the death

## III.  Conclusion

Because Larkins's claims are meritless, IT IS RECOMMENDED that the § 2254 Petition (ECF No. 1) be DENIED and DISMISSED WITH PREJUDICE.

Under 28 U.S.C. § 636(b)(1)(c) and Fed. R. Civ. P. 72(b), a party may file written objections to this Report and Recommendation within 14 days of service, unless the Court grants an extension of time to file objections under Fed. R. Civ. P. 6(b).  A party may also respond to another party's objections to this Report and Recommendation within 14 days of service of those objections, again unless the Court grants an extension of time to file a response to objections.

No other briefs may be filed without leave of court, which will only be granted for good cause.  A party's failure to timely file written objections to this Report and Recommendation will bar a party from later challenging factual or legal conclusions adopted by the District Judge, except if the challenge asserts "plain error."

Pursuant to Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts, this Court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant. Unless a circuit justice or district judge issues a certificate of appealability, an appeal may not be taken to the court of appeals. Within 14 days from service of this Report and Recommendation, the parties may file a memorandum setting forth arguments on whether a certificate of appealability should issue. *See* 28 U.S.C. § 2253(c)(2).  A

---

penalty, and the State did not seek a punishment of death.  Because Larkins was not prosecuted for a capital offense, *Kennedy* is inapplicable.

courtesy copy of the memorandum shall be provided to the District Judge at the time of filing.

     SIGNED on Tuesday, March 29, 2022.

                          JOSEPH H.L. PEREZ-MONTES
                          UNITED STATES MAGISTRATE JUDGE